#23799-a-JKM

**2007 SD 86**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA                    Plaintiff and Appellee,

  v.

FRED EARL JOHNSON,                        Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE GLEN A. SEVERSON
Judge

* * * *

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General                Attorney for plaintiff
Pierre, South Dakota                      and appellee.

BRYAN G. HALL
Minnehaha County Public
 Defender's Office                        Attorney for defendant
Sioux Falls, South Dakota                 and appellant.

* * * *

ARGUED ON MARCH 20, 2007

OPINION FILED **08/15/07**

#23799

MEIERHENRY, Justice

[¶1.]     Cassandra Breen was found in her driveway with a gunshot wound to her forehead, which she survived.  Breen identified Fred Johnson (Johnson) as the perpetrator.  After a jury trial, Johnson was found guilty of attempted murder and aggravated assault.  Johnson appeals and we affirm.

## FACTS

[¶2.]     On the morning of September 30, 2004, in Baltic, South Dakota, passersby noticed a vehicle sitting at the end of a driveway with the driver's door open.  They stopped to investigate.  They found Breen lying over the console with her head in the passenger's seat.  Her young son was buckled in his car seat in the backseat.

[¶3.]     An emergency medical technician (EMT), who arrived shortly thereafter, observed that Breen had a severe injury to her forehead.  Breen told the EMT that she had been hit in the forehead with a hammer by "Fred."  When law enforcement officer Detective Tommeraasen arrived, Breen told him that her assailant's last name was "Johnson."

[¶4.]     After Breen was transported to the hospital, doctors discovered that she had actually sustained a gunshot wound to her forehead.  According to the neurological surgeon who examined Breen, the bullet entered through the forehead and traveled somewhat lateral through each lobe on the right side of her brain, leaving bullet fragments lodged in various parts of her brain.  Although doctors were able to dislodge the bullet fragments in the frontal region of Breen's brain, they left a large fragment lodged in the back of the brain to avoid more damage by

-1-

removing it. Breen's injury resulted in permanent physical disabilities including paralysis of her left arm and left foot.

[¶5.] Prior to the shooting, Breen and Johnson were involved in a tumultuous "on again, off again" relationship, which deteriorated shortly after the birth of their son. Breen eventually moved from her original location in Sioux Falls, South Dakota, to her parents' home in Baltic, South Dakota. Notwithstanding the move, they had bitter disputes over Johnson's visitations with their son. Ultimately, the disputes culminated in the shooting on the morning of September 30, 2004.

[¶6.] Less than two hours after the incident, at approximately 8:15 AM, Turner County Sheriff Byron Nogelmeier arrived at Johnson's home in Monroe, South Dakota. He found Johnson hanging up laundry behind his house. His children from a prior marriage were playing on the driveway and in the backyard. Sheriff Nogelmeier informed Johnson that he was responding to instructions from Minnehaha County law enforcement to arrest Johnson for aggravated assault against Breen. However, after speaking with Johnson, Sheriff Nogelmeier felt uncomfortable arresting Johnson because of Johnson's convincing explanation that he was at home that morning with his three kids and without a working vehicle. Since Sheriff Nogelmeier was unclear about the details of the alleged attack, he suggested they talk to Minnehaha County law enforcement. Johnson agreed with Sheriff Nogelmeier's suggestion to meet with Minnehaha County law enforcement at the Turner County Sheriff's office in Parker. Sheriff Nogelmeier then transported Johnson and his children to Parker, approximately ten miles away.

[¶7.] Johnson and his children waited in the interrogation room in Parker until Minnehaha County Deputy Pete Jaros and Detective Philip Toft arrived. Johnson's children were then removed from the interrogation room and placed in the care of Johnson's ex-wife. Detective Toft testified that he began to read the *Miranda* rights to Johnson but Johnson kept interrupting him and insisting that he wanted to cooperate and talk with law enforcement. Consequently, Detective Toft did not complete the advisement and did not specifically advise Johnson that anything Johnson said could be used as evidence against him. When Detective Toft finished questioning Johnson, he informed Johnson that he had probable cause to arrest him but wanted to continue questioning him in Sioux Falls. Johnson agreed and was placed in Deputy Jaro's vehicle and taken to the law enforcement center in Sioux Falls.

[¶8.] After arriving at the law enforcement center, the interrogation continued. Before Detective Toft questioned Johnson further, he told Johnson that he was not under arrest and apprised Johnson of all of his *Miranda* rights. He then questioned Johnson for approximately three hours after which he placed Johnson under arrest.

[¶9.] The State filed an indictment charging Johnson with attempted murder in violation of SDCL 22-16-4 and SDCL 22-4-1. The indictment also charged Johnson with three counts of aggravated assault in violation of SDCL 22-18-1.1(1), (2), (4) and commission of a felony while armed with a firearm in violation of SDCL 22-14-12. Johnson sought to have his statements to law enforcement officers suppressed. The trial court denied the motion and a jury trial was held.

[¶10.]     At trial, Breen testified about what occurred on the morning of September 30th. She testified that "it was Fred Johnson" and that she remembered him "coming out of the car yelling at [her] and. . . pulling [her car] door open." Breen testified that Johnson then threatened her, stating, "listen here bitch, no one is going to take my son away." The next thing Breen was able to remember was waking up in the hospital. At the close of the evidence, the jury returned a verdict finding Johnson guilty of first degree attempted murder, one count of aggravated assault, and the commission of a felony while armed with a firearm. Johnson was sentenced to a total of sixty-five years imprisonment – twenty-five years for attempted first degree murder, fifteen years for aggravated assault; and twenty-five years for committing a felony while armed.

[¶11.]     Johnson appeals and raises the following issues.

### ISSUES

1. Whether the trial court erred when it found that a conviction and sentence for attempted murder and aggravated assault was not a violation of Johnson's right against double jeopardy.
2. Whether the trial court erred when it denied Johnson's motion to suppress the statements he made to law enforcement on September 30, 2004.
3. Whether the trial court erred when it limited Johnson's cross-examination of Breen.

### ANALYSIS

*1. Double Jeopardy*

[¶12.]     Johnson claims his right against double jeopardy was violated when he was convicted and sentenced for both the offense of attempted first degree murder and aggravated assault. The Fifth Amendment to the United States Constitution

provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." US Const. Amend V; *see also* State v. Lafferty, 2006 SD 50, ¶4, 716 NW2d 782, 784. Similarly, South Dakota's Constitution provides that "[n]o person shall . . . be twice put in jeopardy for the same offense." *Id.* (citing SD Const Art VI, section 9). "These prohibitions against double jeopardy protect against three types of governmental abuses: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *Id.* We review double jeopardy claims under the de novo standard of review. *Id.*

[¶13.]     Johnson's claim stems from a single act, which resulted in multiple charges under different criminal statutes; thus he claims he was subject to multiple punishments for the same offense. *See also* State v. Chavez, 2002 SD 84, ¶18, 649 NW2d 586, 593 (considering whether defendant could be convicted of multiple violations of the same criminal statute); State v. Augustine, 2000 SD 93, ¶24, 614 NW2d 796, 799 (same). "Established double jeopardy jurisprudence confirms that the Legislature may impose multiple punishments for the same conduct without violating the Double Jeopardy Clause if it clearly expresses its intent to do so." State v. Weaver, 2002 SD 76, ¶8, 648 NW2d 355, 358 (quoting State v. Dillon, 2001 SD 97, ¶14, 632 NW2d 37, 43 (citing Garrett v. United States, 471 US 773, 778, 105 SCt 2407, 2411, 85 LEd2d 764 (1985))). "The true intent of the legislature is ascertained primarily from the language of the statute." *Lafferty*, 2006 SD 50, ¶6, 716 NW2d at 784; *see also Garrett*, 471 US at 779, 105 SCt at 2411, 85 LEd2d 764.

[¶14.] Johnson argues there is no indication that the Legislature intended to impose punishment for both the offense of attempted murder and the offense of aggravated assault arising out of the same conduct. Johnson contrasts the specific language used by the Legislature in SDCL 22-14-12 (commission of felony while armed). The felony-while-armed statute clearly indicates that a sentence can be imposed in addition to the principal felony. SDCL 22-14-12. The statute specifically provides:

> Any sentence imposed under this section shall be consecutive to any other sentences imposed for a violation of the principal felony. The court may not place on probation, suspend the execution of the sentence, or suspend the imposition of the sentence of any person convicted of a violation of this section.

SDCL 22-14-12.

[¶15.] Johnson argues that the absence of specific language in the attempted murder and aggravated assault statutes supports his claim that the Legislature did not intend to impose two penalties for the same conduct. To determine legislative intent, we first examine the statutory elements of the crimes of aggravated assault and first degree murder. The statutory elements of aggravated assault are, in relevant part, as follows:

> Any person who:
> (1) Attempts to cause serious bodily injury to another, or causes such injury, under circumstances manifesting extreme indifference to the value of human life;
> (2) Attempts to cause, or knowingly causes, bodily injury to another with a dangerous weapon;
> . . .
> (4) Assaults another with intent to commit bodily injury which results in serious bodily injury;

SDCL 22-18-1.1.  The statutory elements of "Attempt" are defined as ". . . any person who attempts to commit a crime and, in the attempt, does any act toward the commission of the crime. . . ."  SDCL 22-4-1.  The relevant statutory elements of first degree murder are as follows:  "Homicide is murder in the first degree:  If perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being, including an unborn child."  SDCL 22-16-4 (1).

[¶16.]      These statutes do not expressly preclude or authorize cumulative punishments.  Thus, the legislative intent is uncertain.  "[W]hen legislative intent to impose multiple punishments is uncertain. . . we employ the *Blockburger* analysis."  *Dillon*, 2001 SD 97, ¶18, 632 NW2d at 45 (citing Blockburger v. United States, 284 US 299, 304, 52 SCt 180, 182, 76 LEd 306, 309 (1932)).  The *Blockburger* analysis is a rule of statutory construction to help determine legislative intent.  *Lafferty*, 2006 SD 50, ¶11, 716 NW2d at 786.  Under *Blockburger*, "the test to be applied to determine whether there are two separate offenses or only one is whether each provision requires proof of an additional fact which the other does not."  *Id.* ¶10*; see also* Rutledge v. United States, 517 US 292, 297, 116 SCt 1241, 1245, 134 LEd2d 419 (1996) (applying the *Blockburger* test).  "Whether conduct constitutes more than one offense is to be found by examining only the statutory elements comprising the offenses without regard to how the offenses were charged, how the jury was instructed, or how the underlying proof for the necessary elements was established."  *Dillon*, 2001 SD 97, ¶18, 632 NW2d at 45 (citing *Blockburger*, 284 US at 304, 52 SCt at 182, 76 LEd 306).

[¶17.]     Attempted murder requires the perpetrator (1) to attempt to kill a human being with (2) "a premeditated design to effect death." SDCL 22-16-1; SDCL 22-16-4; SDCL 22-4-1. Aggravated assault does not require a premeditated design to effect death. It does, however, require the victim to suffer "serious bodily injury." SDCL 22-18-1.1(4). Suffering "serious bodily injury" is not an element of attempted murder. Attempted murder only requires a premeditated design to effect the death of the victim and some act toward its commission. Although in some cases the required act toward committing the murder may result in serious bodily injury, it is not a statutory element of attempted murder. One can envision situations in which one could be convicted of attempted murder without any injury to the intended victim, for example shooting at someone and missing. Consequently, we must conclude that each offense requires proof of a fact which the other does not. In other words, aggravated assault requires proof of the statutory element of "serious bodily injury" while attempted murder does not. One is not subsumed into the other as a lesser included offense.

[¶18.]     Other jurisdictions have reached a similar conclusion. In *State v. Armendariz*, the New Mexico Supreme Court concluded that a defendant's convictions for both attempted murder and aggravated assault did not violate double jeopardy protections. 141 P3d 526, 533-34 (NM 2006). The Court stated:

> Attempted murder requires an overt act, an intent to commit murder, and the failure to complete the crime, none of which are elements of aggravated battery. Aggravated battery requires an unlawful touching or application of force, which attempted murder does not.
> . . .

> The prohibition against attempted murder is directed at protecting a person's life and the statute is directed at punishing a person's state of mind, whereas the prohibition against aggravated battery is directed at protecting a person from bodily injury and the statute is directed at punishing actual harm. Although similar, we must construe these harms narrowly. Statutes that are "directed toward protecting different social norms and achieving different policies can be viewed as separate and amenable to multiple punishments.". . . Further, although the two statutes may be violated together, they are not necessarily violated together. There are countless situations where aggravated battery is committed with only an intent to injure, not an intent to kill. "The fact that each statute may be violated independent of the other will also lend support to the imposition of sentences for each offense."

*Id.*; *see also* State v. Florida, 894 So2d 941, 946 (Fla 2005); *cf.* State v. Clarke, 475 NW2d 193, 194-95 (Iowa 1991) (applying a similar analysis and concluding that aggravated assault is not a lesser included offense of attempted murder); State v. Gisege, 561 NW2d 152, 156 (Minn 1997) (same); State v. Halsey, 441 NW2d 877, 881 (Neb 1989) (same); State v. Ellis, 625 NW2d 544, 548-49 (ND 2001) (same).

[¶19.] While there is no explicit language that authorizes or prohibits punishment for both attempted murder and aggravated assault arising from a single transaction, under the analysis set forth in *Blockburger v. United States*, Johnson's double jeopardy claim fails. Both the offense of attempted murder and the offense of aggravated assault require proof of an element that the other does not. Thus, Johnson's right against double jeopardy was not violated by being convicted and sentenced to aggravated assault and attempted murder.

*2. Denial of Johnson's Motion to Suppress*

[¶20.] When Detective Toft questioned Johnson in the Turner County Sheriff's office at Parker, South Dakota, he began to explain the *Miranda* rights.

He told Johnson that he had a right to remain silent but was interrupted by Johnson who indicated he wanted to talk. Johnson was fully informed of his rights before law enforcement questioned him further in Sioux Falls. In answer to a question as to why the Detective did not fully advise Johnson of his *Miranda* rights before the Parker questioning, Detective Toft explained:

> [A]s I was explaining the rights, I guess I was thrown off a little bit. . . . [Johnson] interrupted me and said I want to talk to you, where I at the time said that you have a continuing right to remain silent and he said, I want to talk to you, and I went right into you have a right to consult with and have the presence of an attorney without mentioning that anything you say can be used as evidence against you.

Johnson claims that because he was not told that anything he said could be used against him, his statements to Detective Toft at Parker and later in Sioux Falls should be suppressed. In neither questioning did Johnson admit to the crimes. The State, however, used his statements against him as statements against interest. *See* SDCL 19-16-32 (Rule 804(b)(3)).

[¶21.] The trial court denied Johnson's motion to suppress his statements because he found that Johnson's statements in Parker were noncustodial. Johnson argues that he was in custody when he was questioned in Parker and was entitled to be advised of all of his *Miranda* rights. We review motions to suppress based on alleged violations of constitutionally protected rights de novo. State v. Carothers, 2006 SD 100, ¶19, 724 NW2d 610, 618.

[¶22.] The test for determining whether someone is in custody for purposes of the *Miranda* warnings is two part.

> [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a

> reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

Yarborough v. Alvarado, 541 US 652, 663, 124 SCt 2140, 2149, 158 LEd2d 938 (2004) (quoting Thompson v. Keohane, 516 US 99, 112, 116 SCt 457, 457, 133 LEd2d 383 (1995)). As part of this inquiry, the question "is 'not whether the investigation has focused on any particular suspect, but rather, whether the person being questioned is in custody or deprived of his or her freedom to leave.'" *Carothers,* 2006 SD 100, ¶20, 724 NW2d at 619 (quoting State v. Herting, 2000 SD 12, ¶9, 604 NW2d 863, 865); *see also* Stansbury v. California, 511 US 318, 326, 114 SCt 1526, 1530, 128 LEd2d 293, 301 (1994). We determine whether a defendant is in custody from the "objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." State v. Thompson, 1997 SD 15, ¶25, 560 NW2d 535, 540 (quoting *Stansbury*, 511 US at 323, 114 SCt at 1529, 128 LEd2d 293). Accordingly, "police officers are not required to administer *Miranda* warnings to everyone whom they question." *Id.* ¶23.

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'

*Id.* (quoting Oregon v. Mathiason, 429 US 492, 495, 97 SCt 711, 714, 50 LE2d 714, 719 (1977)).

[¶23.]     Johnson argues that he was in custody when he was questioned in Parker, South Dakota, requiring law enforcement to fully advise him of his *Miranda* rights. Johnson argues that the facts surrounding his initial contact with Sheriff Nogelmeier together with the circumstances of his interview with Detective Toft support his claim that he was in custody for purposes of *Miranda*.

[¶24.]     When Sheriff Nogelmeier first contacted Johnson, he told Johnson it was because Minnehaha County law enforcement told him to arrest Johnson for aggravated assault. Johnson claims that the "moment Sheriff Nogelmeier arrived at [Johnson's] residence, [he] was not free to leave." Thus, Johnson claims, the directive to arrest him, his transport to Parker in the Sheriff's vehicle and subsequent placement in an interrogation room were circumstances under which a reasonable person would believe he was in custody. He also claims that he was never told he was free to leave or could refuse to talk with law enforcement during the two and one-half hour interrogation.

[¶25.]     On the other hand, the State points to additional circumstances surrounding law enforcement's contact with Johnson that support a finding of noncustodial questioning. The State emphasizes the fact that Sheriff Nogelmeier changed plans and did not arrest Johnson at his home because of Johnson's explanations. Sheriff Nogelmeier testified that Johnson convinced him that he was at home with his three kids and did not have a working vehicle. The Sheriff testified that "at this point I did not feel comfortable arresting him at all and never

did say he was under arrest." He told Johnson, "Boy, you better talk to somebody other than me because I'm pretty much in the dark as to what's going on. If we should maybe, we should get a hold of Minnehaha County, of the deputy that's investigating this, and, you know, you can talk to him." Johnson was overtly cooperative with the Sheriff and indicated he was willing to speak with law enforcement about Breen's accusations. Consequently, Sheriff Nogelmeier contacted Minnehaha County law enforcement to inform them that he felt uncomfortable arresting Johnson.

[¶26.]    Sheriff Nogelmeier testified that Johnson agreed to talk with Minnehaha County law enforcement because "he want[ed] to get this thing cleared up, [those were] pretty much Fred's exact words. Yeah, I want to get this thing cleared up. Yeah I'll talk to anybody." The Sheriff offered either to call the Minnehaha County deputy to see if the deputy wanted to come to Johnson's residence or give Johnson a ride "somewhere." Johnson accepted a ride with Sheriff Nogelmeier to Parker. Johnson sat in the front seat with the Sheriff and his three children sat in the back seat. He was not handcuffed or in any other way restrained. Johnson later told Detective Toft that "if I would have had a car, I would have come to you."

[¶27.]    As they waited for Detective Toft to arrive, Johnson waited in an office area with his children. He freely walked around and at one point left the room. Detective Toft's taped interview of Johnson shows that the atmosphere remained nonconfrontational. Detective Toft began the interview by advising Johnson he was not under arrest. Johnson remained cooperative throughout the interview and the

tone of the interview was conversational. Johnson encouraged Detective Toft to continue the investigation and suggested that police complete a gun shot residue analysis of his clothing and hands, a search of his home, and a search of his car. Johnson also told Detective Toft that he "did not want to wait" and wanted to "get this taken care of." Throughout the interview, Johnson volunteered information about his past relationship with Breen. Johnson also continually changed his story about his activities the morning of the shooting. There were several points in the interview that Johnson would add more detail to a previous answer, and Detective Toft would ask Johnson to clarify his previous statements.

[¶28.] After reviewing the record, there is no indication that Johnson was coerced into making any statements through the "inherently compelling pressures" of a custodial setting. Miranda v. Arizona, 384 US 436, 467, 86 SCt 1602, 1624, 16 LEd2d 694 (1966). Although Sheriff Nogelmeier initially told Johnson he had been advised to arrest Johnson, "the weight and the pertinence of [a statement from an officer] will depend on the facts and circumstances surrounding this case." State v. Morato, 2000 SD 149, ¶20, 619 NW2d 655, 661 (quoting Stansbury, 511 US at 325, 114 SCt at 1530, 128 LEd2d at 300). "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." Thompson, 1997 SD 15, ¶25, 560 NW2d at 540. Sheriff Nogelmeier did not take any steps to place Johnson in custody because of Johnson's convincing story that he had no transportation. Johnson then agreed to accompany Sheriff Nogelmeier to Parker, although he had the option of waiting until

Minnehaha County law enforcement officers questioned him at his home later on that day. Once Johnson arrived in Parker, the record does not indicate that he was specifically told he was free to leave. However, he was advised he was not under arrest, was never restrained in any way and was free to move about. Although the door of the interrogation room was closed, we have stated, "'a closed or even locked door, does not, in and of itself, create a custodial interrogation.'" *Carothers*, 2006 SD 100, ¶22, 724 NW2d at 619 (quoting *Thompson*, 1997 SD 15, ¶28, 560 NW2d at 541). Based on the totality of the circumstances, a reasonable person under the circumstances would not have considered himself in custody. Thus, the trial court's determination that Johnson was not in custody for purposes of *Miranda* was not erroneous, nor did the trial court err when it denied Johnson's motion to suppress.[1]

[¶29.]     Johnson further argues that his statements should be suppressed because they were involuntarily made. When examining the voluntariness of a confession, this Court considers "the totality of the circumstances, giving deference to the trial court's factual findings, but performing a de novo review of the record, and making 'an independent determination of the ultimate issue of voluntariness.'" *Id.* ¶23 (quoting State v. Tofani, 2006 SD 63, ¶30, 719 NW2d 391, 399). We consider several factors including: "(1) the defendant's age; (2) the defendant's lack of education or low intelligence; (3) the absence of any advice to the defendant of [his or her] constitutional rights; (4) the length of detention; (5) the repeated and

---

1.     Because the trial court did not err when it concluded Johnson was not in custody for purposes of *Miranda*, we do not consider Johnson's argument that the trial court erred when it failed to suppress the statements Johnson made to law enforcement officers in Sioux Falls because the questioning was a continuation of the unwarned questioning in Parker.

prolonged nature of the questioning; (6) the use of physical punishment such as deprivation of food or sleep"; and (7) defendant's previous experience with law enforcement. *Id.* ¶¶23-24 (citation omitted).

[¶30.]     Johnson was forty years old at the time of the questioning and exhibited a sufficient level of intelligence to understand he was free to leave at any time. Johnson was advised of his constitutional rights with the exception that Detective Toft failed to advise Johnson that any of his statements could be used against him in his initial interview in Parker. The length of Johnson's interview in Parker was approximately two and one-half hours. The length of Johnson's interview in Sioux Falls was approximately three hours. At no time did Johnson request to stop the interview and, in fact, stated that he wanted to accompany Detective Toft to Sioux Falls to get this taken care of and did not want to wait. The questioning was somewhat repetitive in nature because Johnson continuously offered more explanation and often altered his previous statements. Johnson was not deprived of food or sleep. Johnson was offered food in Parker but declined. However, he received food before being interviewed in Sioux Falls. There was no indication that Johnson was impaired at the time of the interview.[2] Johnson had several prior experiences with law enforcement, which he discussed during his interview. Based upon the totality of the circumstances, we conclude that the trial

---

2.     During the initial interview in Parker, Johnson informed Detective Toft that he had taken Celebrex earlier in the morning for pain in his back. Johnson stated that the pills made him tired but there was no indication that he was impaired at the time of the interview.

court did not err when it concluded that Johnson's statements were voluntarily made and denied Johnson's motion to suppress.

*3. Cross-examination of Breen*

[¶31.] Johnson argues that the trial court abused its discretion when it limited Johnson's cross-examination of Breen at trial, in regard to an incident that had occurred approximately seven days before Johnson's trial. Prior to trial, the State filed a motion in limine seeking to prohibit Johnson from introducing testimony regarding "any and all reference to incidents occurring on June 13, 2005, which led to the arrest of Raphel F. Knowles in Minnehaha County, South Dakota, on the basis of alleged parole violation and drug possession, and Cassandra Breen's presence for alleged involvement in such activity." The State contended the testimony was irrelevant and that the probative value was outweighed by its prejudicial effect. The trial court initially granted the motion for purposes of opening statements and voir dire but deferred ruling on the motion for purposes of cross-examination until Breen testified.

[¶32.] During Breen's cross-examination, Johnson began to question Breen about the June 13th incident, and the State objected on grounds of relevancy. The trial court sustained the objection and granted the State's pre-trial motion to prohibit any testimony concerning it. The trial court noted that there had been no showing of recent fabrication and concluded that the incident was irrelevant and that "any very limited probative effect, if any, as to . . . motive [was] outweighed by unfair prejudicial effect."

[¶33.]     Johnson was then allowed to make an offer of proof. Johnson questioned Breen regarding the night of June 13th when police found methamphetamine in her purse after police stopped her vehicle, which was driven by Ralph Knowles. Breen admitted that instead of arresting her, police advised Breen to call the prosecutor of Johnson's case. Breen also stated that she was never arrested as a result of this incident and claimed that the drugs were not hers.

[¶34.]     Johnson argues that his constitutional right to cross-examine the State's witnesses was denied when he was not allowed to impeach Breen by showing bias. Johnson argued that Breen's encounter with police was directly tied to her motive to testify as a witness in Johnson's case. Johnson generally argues that he had the right to attack Breen's credibility.[3]

[¶35.]     The right to confront witnesses is guaranteed by the Sixth Amendment to the United States Constitution and by Article VI, section 7 of the South Dakota Constitution. State v. Walton, 1999 SD 80, ¶25, 600 NW2d 524, 530. "[E]xposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." State v. Koepsell, 508 NW2d 591, 595 (SD 1993). Nevertheless, "the trial court retains broad discretion concerning the limitation of cross-examination and it will be reversed only when there is a clear abuse of that discretion and a showing of prejudice to the defendant." Id. Therefore even if we were to find an abuse of discretion, the defendant still has the burden of showing that "a reasonable jury probably would

---

3.     Johnson fails to cite any rule of evidence or authority for his argument that the trial court abused its discretion other than the general right to cross-examine witnesses under both the federal and state constitution.

have a significantly different impression if otherwise appropriate cross-examination had been permitted." *Id.* Johnson has failed to meet this burden.

[¶36.] Breen's first identification of Johnson as the attacker occurred shortly after she had been shot on the morning of September 30th. Both Detective Tommeraasen and the EMT who were at the scene testified that she told them it was Fred Johnson who attacked her that morning. There was no showing that her testimony differed or was possibly influenced by the fact she was present at the June 13th incident that resulted in a drug charge against Knowles. Thus, Johnson has failed to show that a reasonable jury probably would have a significantly different impression of Breen's testimony if otherwise appropriate cross-examination had been permitted. Without a showing of prejudice to Johnson, we find no error.

[¶37.] Affirmed.

[¶38.] GILBERTSON, Chief Justice, and KONENKAMP, and ZINTER, Justices, concur.

[¶39.] SABERS, Justice, dissents in part, concurs in result in part and concurs in part.


SABERS, Justice (dissenting in part, concurring in result in part and concurring in part).

*Double Jeopardy*

[¶40.] I dissent on Issue 1. A single gunshot to the head cannot support two separate convictions for attempted murder and aggravated assault. This violates

the Double Jeopardy provisions of the United States Constitution and the South Dakota Constitution.

[¶41.]     This Court has previously indicated that only "the Legislature may impose multiple punishments for the same conduct without violating the Double Jeopardy Clause" only "if it *clearly expresses its intent to do so.*"  State v. Weaver, 2002 SD 76, ¶8, 648 NW2d 355, 358 (quoting State v. Dillon, 2001 SD 97, ¶14, 632 NW2d 37, 43 (citing Garrett v. United States, 471 US 773, 778, 105 SCt 2407, 2411, 85 LEd2d 764 (1985))) (emphasis added).  When determining legislative intent, we look to the language of the statute.  *Lafferty*, 2006 SD 50, ¶6, 716 NW2d at 784 (citing State v. Bordeaux, 2006 SD 12, ¶8, 710 NW2d 169, 172).  When we examine the language of the statutes at issue in this case, there is no indication that the Legislature specifically intended to impose punishment for both the offense of attempted murder and the offense of aggravated assault that arise out of the same conduct.

[¶42.]     SDCL 22-14-12 clearly indicates that committing a felony while armed can be punished in addition to the principal felony.  However, this clear imposition of additional punishment is noticeably absent from the attempted murder and aggravated assault statutes.  *See* SDCL 22-16-4; SDCL 22-18-1.1.  The majority opinion suggests the omission of any cumulative punishment language makes the legislative intent unclear.  I submit the omission of cumulative punishment language has the opposite effect.  The Legislature knew how to impose cumulative punishments as indicated in SDCL 22-14-12; had it wished to impose cumulative punishments for attempted murder and aggravated assault offenses that arise out

of the same act, it knew how to do so and it could have done so. The fact that it did not choose to insert the cumulative punishment language into SDCL 22-18-1.1 and SDCL 22-16-4, when it used the language elsewhere in the same chapter, indicates that it did not wish to impose cumulative punishment. Because the legislative intent is clear, it is not necessary to reach the *Blockburger* test. *See Garrett*, 471 US at 779, 105 SCt at 2411, 85 LEd2d 764; *Lafferty*, 2006 SD 50, ¶11, 716 NW2d at 786 (noting that the *Blockburger* test is not controlling when the legislative intent is clear) (additional citations omitted).

[¶43.]       This case is similar to the Washington Court of Appeals case of *State v. Gohl*, 37 P3d 293 (WashCtApp 2001). The Division 1 of the Washington Court of Appeals vacated the assault conviction when the defendant had also been found guilty of attempted murder. *Id.* at 296. In *Gohl*, similar to this case, the assault and attempted murder convictions stemmed from one act. *Id.* at 295. When deciding double jeopardy applied, it noted:

> [I]t is unlikely the Legislature intended to punish a single assaultive act as both assault and attempted murder. There is no reason that a single assault should give rise to only one conviction if the victim dies, where the charge would be murder and assault, but two convictions if the victim survives, where attempted murder and assault would be charged.

*Id.* (citing State v. Valentine, 29 P3d 42, 44 (WashCtApp 2001)). A similar result was reached by this Court in *State v. Dillon*, where the unanimous court held that Double Jeopardy prohibited two separate convictions for the same conduct of first degree rape and criminal pedophilia arising out of one act of penetration. 2001 SD 97, ¶22, 632 NW2d at 46. Here, it is inconceivable to think the Legislature

intended double punishment for assault and attempted murder arising out of one gunshot. The Legislature knew how to impose double punishment and did so within the same chapter. Because the Legislature has chosen not to impose double punishment for attempted murder and aggravated assault arising out of the same act, the Double Jeopardy clause was violated.

[¶44.] Due to the Double Jeopardy violation, we should vacate the lesser offense of aggravated assault and remand for resentencing on the attempted murder conviction. *See id.*

*Motion to Suppress*

[¶45.] I disagree with the majority opinion's determination that Johnson was not in custody. The Turner County Sheriff was instructed to arrest Johnson based on probable cause. Johnson may have talked the deputy into having misgivings about arresting him, causing the deputy to give Johnson an opportunity to talk with the Minnehaha County officers, but Johnson was never free to leave and agreed to go to the Turner County Sheriff's Office with his children.

[¶46.] Ultimately, whether or not he was in custody is immaterial because he waived his *Miranda* rights when he interrupted the officer and proceeded to talk. I agree with the majority opinion's conclusion that Johnson's statements were voluntarily made. Johnson voluntarily made statements to the officers and was not entitled to have those statements suppressed. The defendant was so eager to voluntarily talk to the detective that he interrupted the detective while he was being *Mirandized*. Therefore, I concur in result.

#23799

*Cross-Examination of Breen*

[¶47.]        I concur on Issue 3.