#24411-a-JKM

**2008 SD 79**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                           Plaintiff and Appellee,

    v.

JAMES ALBERT COTTIER,                           Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JOSEPH NEILES
Judge

* * * *

LAWRENCE E. LONG
Attorney General

ANDREW KNECHT
Assistant Attorney General           Attorneys for plaintiff
Pierre, South Dakota              and appellee.

MATTHEW L. OLSON
JEFF LARSON
Office of the Minnehaha
 County Public Defender         Attorneys for defendant
Sioux Falls, South Dakota       and appellant.

* * * *

ARGUED ON APRIL 24, 2008

OPINION FILED **08/06/08**

#24411

MEIERHENRY, Justice

[¶1.]    A jury convicted James Cottier (Cottier) of Manslaughter in the First

Degree with a Dangerous Weapon, in violation of 22-16-15(3) (2005).[1]  Cottier

appeals and we affirm.

**FACTS**

[¶2.]    On June 21, 2005, a worker found the badly cut-up body of Cameron

Red Star on the grounds of the South Dakota School for the Deaf in Sioux Falls,

South Dakota.  The prior evening, Red Star, Cottier, and a third individual, Wesley

Running, were seen together at the Salvation Army and area convenience stores.

The three homeless men spent the night drinking.  Workers at the Salvation Army

and convenience stores testified that the men smelled of alcohol and appeared

intoxicated.  The Salvation Army employees tested the blood alcohol levels of all

three and found they all had consumed significant levels of alcohol.  Running's blood

alcohol level was so high that he was not allowed to sleep at the facility.  The three

ate at the Salvation Army and then left together.

[¶3.]    The trio proceeded to a convenience store to purchase more alcohol.

While consuming the alcohol, Cottier claimed that Red Star and Running began to

fight over an eagle feather in Running's possession.  Red Star eventually forcibly

---

1.    The pertinent portion of SDCL 22-16-15 (2005) provided:
        Homicide is manslaughter in the first degree when perpetrated:
                                    ***
        (3) Without a design to effect death, but by means of a
        dangerous weapon;
                                    ***
        Manslaughter in the first degree is a Class 1 felony.

-1-

took the feather from Running who then fled. Later that night an officer picked up Running and took him to a detoxification facility.

[¶4.] In the meantime, Red Star and Cottier went to another convenience store and bought two forty-ounce bottles of Hurricane Malt Liquor. The two then found shelter under an entryway to a building on the campus of the South Dakota School for the Deaf. Cottier testified at trial that he sat on a bench and drank as Red Star began pacing back and forth, boasting that he was a member of the "War Lord" gang.

[¶5.] Cottier testified that Red Star told him that two families Cottier knew to be violent were going to harm Cottier. According to Cottier, Red Star then hit him in the head repeatedly, choked him, pulled him around by the hair and slammed his head against a brick wall. Cottier testified that while he and Red Star were wrestling and with Red Star on top of him, Cottier grabbed his beer bottle and broke it against the ground. Cottier then used the broken bottle to stab Red Star repeatedly in the face, neck and torso. Cottier claimed that Red Star continued to assault him, but eventually ended the attack and lay on the ground motionless for about thirty seconds. Cottier admitted that he then picked up a nearby rock with both hands and hit Red Star in the head two or three times, killing him. Cottier admitted that Red Star's eyes were open and that he looked at Cottier before Cottier struck him with the rock. After the fatal blows, Cottier sat on a nearby bench to drink a beer and catch his breath. Cottier admitted that he checked Red Star's pulse and looked in Red Star's pockets. He also admitted taking a bag of marijuana from Red Star's body. When police arrived at the scene, Red Star's pockets were

#24411

turned out and his identification and other personal items were lying close to his body.

[¶6.] Cottier was charged and tried on three counts: 1) first degree murder in violation of SDCL 22-16-4; 2) first degree manslaughter "in a heat of passion" in violation of SDCL 22-16-15(2); and 3) first degree manslaughter "by means of a dangerous weapon" in violation of SDCL 22-16-15(3). Cottier was found not guilty on counts 1 and 2, but was found guilty on count 3 of killing Cameron Red Star "without a design to effect death, but by means of a dangerous weapon, a rock." Cottier appeals and raises the following issues:

## ISSUES

1) **Whether the trial court erred when instructing the jury on self defense.**
2) **Whether the trial court erred in denying defendant's motion to suppress his statements to police.**
3) **Whether the trial court erred by not admitting the victim's prison record or video of Wesley Running's interrogation.**

## DECISION

1) **Whether the trial court erred when instructing the jury on self defense.**

[¶7.] We have clarified our standard of review for jury instructions as follows:

> A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard. However, no court has discretion to give incorrect, misleading, conflicting, or confusing instructions: to do so constitutes reversible error if it is shown not only that the instructions were erroneous, but also that they were prejudicial.

State v. Packed, 2007 SD 75, ¶17, 736 NW2d 851, 856 (quoting Vetter v. Cam Wal

Elec. Co-op., Inc., 2006 SD 21, ¶10, 711 NW2d 612, 615) (internal citations omitted).

> Erroneous instructions are prejudicial under SDCL 15-6-61
> when in all probability they produced some effect upon the
> verdict and were harmful to the substantial rights of a party.
> Accordingly, when the question is whether a jury was properly
> instructed overall, that issue becomes a question of law
> reviewable de novo. Under this de novo standard, "we construe
> jury instructions as a whole to learn if they provided a full and
> correct statement of the law."

Papke v. Harbert, 2007 SD 87, ¶13, 738 NW2d 510, 515 (quoting *Vetter,* 2006 SD 21,

¶10, 711 NW2d at 615 (quoting State v. Frazier*,* 2001 SD 19, ¶35, 622 NW2d 246,

259 (citations omitted)).

[¶8.]        The trial court instructed the jury on the defense of justifiable

homicide structured around SDCL 22-16-34 (2005) and SDCL 22-16-35 (2005). The

statutes provided as follows:

> Homicide is justifiable when committed by any person when
> resisting any attempt to murder such person, or to commit any
> felony upon him or her, or upon or in any dwelling house in
> which such person is.

SDCL 22-16-34 (2005).

> Homicide is justifiable when committed by any person in the
> lawful defense of such person, or of his or her husband, wife,
> parent, child, master, mistress, or servant when there is
> reasonable ground to apprehend a design to commit a felony, or
> to do some great personal injury, and imminent danger of such
> design being accomplished.

SDCL 22-16-35 (2005). Cottier had no objection to the trial court's instructions

based on the two statutes. He did, however, object to the court giving six additional

instructions numbered 31 to 36. Cottier objected to Instructions 31 and 36 because

they both instructed on the right of self defense against an assault not rising to the

level of a felony aggravated assault and the lawful degree of force in defending against a non-felony assault.

[¶9.]    Instruction 32 explained that one being attacked can legally defend oneself and pursue the attacker if it is reasonable and necessary. Instruction 33 explained what constituted a lawful self defense against an assault with fists and hands. Instruction 34 explained a situation under which deadly force could not be used in self defense. Instruction 35 explained that a person defending "against unlawful attack has to stop the use of force as soon as the danger of attack ended." When settling instructions, the defense argued that the six instructions were not relevant to the defense of justifiable homicide. Cottier claimed that the challenged instructions limited the language from justifiable homicide against "any felony" to self defense against "aggravated assault" or "assault" and were philosophically inconsistent and conflicting statements of the law. Cottier claimed that to infuse the additional irrelevant instructions concerning retreat and the necessity to stop when the danger ends only served to confuse the jury and blurred the true issue of justification.

[¶10.]    The trial court overruled Cottier's objections and explained on the record that it wanted the jury to understand the law of "self defense" fully, including the law of self defense against assault not rising to the level of a felony assault and that it anticipated a jury question about non-felony assaults if it did not give the additional instructions.[2] Cottier claims that the trial court's failure to

_____

2.    The trial court gave the following explanation for giving the non-felony self defense instructions:

(continued . . .)

properly instruct the jury denied him his right to a fair trial in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article VI, Section two of the South Dakota Constitution. US Const amend V and XIV; SD Const art VI, § 2.

[¶11.]        Had the trial court only instructed the jury on justifiable homicide without the additional six instructions, it would have been less confusing for the jury. Self defense against non-felony assault was not an issue in the case and superfluous to the jury's decision. Nevertheless, the defense originally proposed defense instructions 9 and 10, which clearly introduced the concept of self defense against a non-felony assault.[3] The record does not reflect that either proposed

_____

(. . . continued)

> I understand that [defense counsel] may not be urging that Mr. Red Star did anything other than a felonious assault upon your client but the jury might conclude that, for instance, that the assault that Mr. Red Star committed, if they find that he did commit an assault, that it was an assault but it didn't rise to the level of a felony. Then the jury, I would anticipate, would be sending me out questions saying what does this mean if it wasn't a felony. I just don't want to have to answer a whole lot of questions about that if, in fact, it does come to that.

3.        Proposed defense instructions 9 & 10 provided as follows:

> DEFENDANT'S PROPOSED JURY INSTRUCTION #9
> If you find that the defendant apprehended an assault by Cameron Red Star, but the assault would not rise to the level of the felony of aggravated assault, then the defendant still had a right of self-defense, but said defense is restricted or limited.
> If you find that the defendant apprehended an assault by Cameron Red Star, but that assault would not rise to the level of a felony, then it is still lawful for the defendant to use or attempt or offer to use force or violence against or toward Cameron Red Star, but the force or violence used by the defendant may be employed only to prevent or attempt to prevent an offense against his person.
>
>                                               (continued . . .)

instruction was withdrawn. In fact, even after the court decided to give the six challenged instructions, the defense urged the trial court to substitute defense instructions 9 and 10 for two of the court's instructions. Consequently, since the court's instructions 31 and 36 mirror defense proposed instructions 9 and 10, Cottier has shown no prejudice in giving those two instructions. Additionally, Cottier admits that two of the instructions, Instructions 33 and 34, actually benefited the defense. Thus, even if Instructions 33 and 34 were irrelevant, no prejudice was shown.

[¶12.] Of the two remaining, Instruction 32 instructed that Cottier had the right to defend himself against an attacker and did not have to retreat, but could, if it appeared reasonable and necessary, pursue the attacker until he was secure from danger, "even if safety may have been more easily gained by withdrawing from the scene." When this instruction is read in conjunction with the trial court's instructions on justifiable homicide, it is an accurate statement of the law. Cottier's defense of justifiable homicide required a showing that he was defending against "imminent danger" of "great personal injury" or "attempted murder" or the attempt

---

(. . . continued)

DEFENDANT'S PROPOSED JURY INSTRUCTION #10
The kind and degree of force which a person may lawfully use in self-defense to an assault he does not apprehend to be a felony assault are limited by what a reasonable person in the same situation, seeing what the defendant sees and knowing what the defendant knows, then would believe to be necessary. Any use of force beyond that is regarded by the law as excessive. Although a person in such a situation may believe that he is acting, and may act in self defense, that person is not justified in using a degree of force clearly in excess of that apparently and reasonably necessary under the existing facts and circumstances.

"to commit a felony upon him." *See* SDCL 22-16-35; SDCL 22-16-34. Instruction 32, by contrast, simply explained that Cottier was not required to retreat from the attack and could pursue the attacker until free from danger. If anything, the extra instruction permitting the "pursuit" of the attacker helped, rather than hurt, Cottier's defense. Under the facts of the case, it was not error to give Instruction 32.

[¶13.]    The final challenged instruction, Instruction 35, provided as follows:

> A person who defends against unlawful attack must stop the use of force as soon as the danger of attack has ended. If it would appear to a reasonable person in the same position that there is no further danger, then there should be no further force.

Cottier claims that the "reasonable person" standard used in the instruction is not required for a justifiable homicide defense. We disagree. When a defendant claims justifiable homicide because he was threatened with serious bodily injury, the responding "force becomes limited to that which is reasonable in the circumstances, and, as the threat of harm dissipates, so does the reasonableness of the force used." State v. Jaques, 428 NW2d 260, 265-66 (SD 1988); *see also* State v. Pellegrino, 1998 SD 39, ¶16, 577 NW2d 590, 596-97 (defining justifiable homicide statute as follows: when persons are "placed in apparent imminent danger of great personal injury, [they] have the right to stand their ground and meet force with force, even to the extent of taking life if such persons actually believe, *and* the circumstances and surrounding conditions are such that a reasonably cautious and prudent person would believe, danger of death or great personal injury to be imminent at the hands of the assailant") (citations omitted) (emphasis added).

[¶14.]     Cottier also claims that a jury question concerning Instruction 35 supports his argument that Instructions 31 through 36 were confusing and prejudicial.  The jury asked:  "Does Instruction 35, where it speaks of unlawful attack.  Does this instruction include a felony assault or a lesser offense?"  The trial court's answer instructed the jury to read Instruction 35 together with the prior instructions defining justifiable homicide.  The defense agreed to the court's answer without conceding the previous objection that the instruction was philosophically inconsistent with justifiable homicide and unsupported by the evidence.  Ultimately, Cottier's main disagreement with Instruction 35 was that is was unnecessary because the justifiable homicide instruction was complete by itself, since the justifiable homicide instruction required "imminent danger."  Although this instruction may not have been necessary, as the defense argues, it is not an incorrect statement of the law.  *See Pellegrino*, 1998 SD 39, ¶16, 577 NW2d at 596-97.

[¶15.]     Thus, because the defense can show no prejudice from instructions 31, 33, 34, or 36, or that instructions 32 and 35 are incorrect statements of the law, the court's instructions did not result in prejudicial error.  *See Papke*, 2007 SD 87, ¶13, 738 NW2d at 515.

>          **2)     Whether the trial court erred in finding that defendant
>                  voluntarily waived his Miranda rights.**

[¶16.]     Cottier next claims that statements he made to law enforcement after being taken into custody should have been suppressed because he was unable to knowingly and intelligently waive his Miranda rights.  Therefore, he claims the questioning violated his rights under the Fifth and Fourteenth Amendments to the

United States Constitution. *See* State v. Morato, 2000 SD 149, ¶11, 619 NW2d 655, 659. Cottier describes himself as unable to waive his rights because: 1) he had barely slept the previous night; 2) he was drunk and possibly high on marijuana at the time; 3) he allegedly had his head slammed into a brick wall by Cottier; 4) he was fatigued and was falling asleep and talking to himself; 5) he was confused; 6) he was "slow" and mentally ill; and 7) he was schizophrenic and not medicated. According to Cottier, the accumulation of these circumstances indicated he was unable to fully understand his *Miranda* rights, and fully appreciate the consequences of waiving his rights.

[¶17.]    Cottier also claims that the interrogating detective used coercive tactics by questioning him knowing that he was intoxicated, tired, mentally ill, off his medications, and sleepy. Cottier claims that based on the totality of the circumstances his statements to the detective were involuntary, and that the trial court abused its discretion when it failed to suppress the statements.

[¶18.]    We review a trial court's grant or denial of a motion to suppress alleged constitutional violations de novo. State v. Johnson, 2007 SD 86, ¶21, 739 NW2d 1, 8-9 (citation omitted). To establish that a defendant waived his *Miranda* rights "the State must show [by a preponderance of the evidence] that (1) the relinquishment of the defendant's rights was voluntary and (2) the defendant was fully aware that those rights were being waived and of the consequences of waiving them." State v. Tuttle, 2002 SD 94, ¶9, 650 NW2d 20, 26 (citation omitted).

[¶19.]    When analyzing the voluntariness of a confession we perform a de novo review of the record; however, we give "deference to the trial court's factual

findings." *Johnson*, 2007 SD 86, ¶29, 739 NW2d at 11 (citation omitted).

Ultimately, "[t]he voluntariness of a confession depends on the absence of police

overreaching. [Colorado v. Connelly], 479 US [157,] 170, 107 SCt [515,] 523, 93

LEd2d [473,] 486. Confessions are not deemed voluntary if, in light of the totality of

the circumstances, law enforcement officers have overborne the defendant's will."

*Tuttle,* 2002 SD 94, ¶20, 650 NW2d at 30 (other citations omitted). "The burden of

proving the voluntariness of a confession is the same as the burden for showing the

voluntariness of a *Miranda* waiver. The State must establish the voluntariness of a

confessant's admission by a preponderance of the evidence." *Id.* ¶21, 650 NW2d at

30 (citation omitted). *See* Cordell v. Weber*,* 2003 SD 143, ¶29, 673 NW2d 49, 58

(citation omitted) ("The relinquishment of the right must have been voluntary in the

sense that it was the product of a free and deliberate choice rather than

intimidation, coercion or deception."). When analyzing allegations of police

coercion:

> [t]he factual inquiry centers on (1) the conduct of law
> enforcement officials in *creating pressure* and (2) the suspect's
> *capacity to resist* that pressure. On the latter factor, we examine
> such concerns as the defendant's age; level of education and
> intelligence; the presence or absence of any advice to the
> defendant on constitutional rights; the length of detention; the
> repeated and prolonged nature of the questioning; the use of
> psychological pressure or physical punishment, such as
> deprivation of food or sleep; and the defendant's prior experience
> with law enforcement officers and the courts. Finally,
> [d]eception or misrepresentation by the officer receiving the
> statement may also be factors for the trial court to consider;
> however, the police may use some psychological tactics in
> interrogating a suspect.

*Tuttle,* 2002 SD 94, ¶22, 650 NW2d at 31 (emphasis added citations and quotations

omitted). *See also* United States v. Gaddy, No. 07-2625 p7 (8thCir filed July 14,

2008) (citations omitted) (noting that "[s]leeplessness, alcohol use and drug use are relevant"; however, they "do not automatically render a confession involuntary." "[T]he test is whether these mental impairments caused the defendant's will to be overborne."). Whether analyzing the propriety of a waiver or the voluntariness of a confession, this Court considers the totality of the circumstances. *Tuttle,* 2002 SD 94, ¶14, 650 NW2d at 28; *Johnson,* 2007 SD 86, ¶29, 739 NW2d at 11.

[¶20.]		Prior to questioning, the detective read Cottier his *Miranda* rights, and he responded that he understood his rights. The detective then asked Cottier: "do you wish to talk to me, do you want to waive your rights and sit here and talk to me," Cottier responded "I wish, I wish, I wish to talk to you." The detective then asked Cottier to sign a *Miranda* warning card; Cottier signed the card and again said "yeah, I wish to talk to you."

[¶21.]		In this case, the trial court found that: 1) Cottier was thirty-six years old, with a ninth grade education; 2) Cottier "was easily able to give his name, spell it, write or print it, and give his date of birth and social security number from memory"; 3) Cottier "had experience in many criminal cases and had felony convictions including a 1991 escape, 1993 hit and run with injury, 1996 assault and 2001 assault by a confined person"; 4) Cottier exhibited no evidence that he "was too tired to voluntarily speak with law enforcement"; 5) Dr. Alsgaard, a board certified psychiatrist, testified that a subsequent competency examination of Cottier "revealed that [he] did possess a considerable knowledge and understanding of the charges, penalties, rights, procedures, defenses and tactical considerations of a criminal case"; 6) "the entire interview was friendly and casual"; 7) Cottier did not

appear to be in pain or discomfort; 8) Cottier was not threatened or promised anything for his answers; and 9) the detective did not at any time use any coercive interrogation techniques on Cottier.

[¶22.]     Still, Cottier contends that because he was drunk, tired, slow and mentally ill, he could not understand the gravity and consequences of his actions. However, the trial court found that Cottier did understand the gravity and consequences of his action.  It also found that Cottier was cognizant enough to provide a false name when picked up by police and to fabricate a detailed lie to explain away his injuries.  Cottier later recanted the lie and admitted that he received the injuries from the altercation with Red Star.  The trial court noted that at one point Cottier spontaneously blurted out to the detective: "I've got an alibi." A review of the taped interview supports the trial court's findings.  Additionally, the detective testified that he could smell alcohol on Cottier but did not observe any indication that Cottier's thinking or behavior were impeded by alcohol consumption. Based on the totality of the circumstances, the trial court did not err in concluding that Cottier knowingly, intelligently and voluntarily waived his *Miranda* rights.

[¶23.]     Cottier also claims that the detective's subsequent interrogation constituted coercion making his statements involuntary.  Cottier's support for this argument  mirrors that for his invalid waiver claim.  Again, Cottier claims that his mental and physical conditions made it impossible for the detective to question him without being coercive.  We disagree.  A review of the taped interview along with the findings of the trial court, discussed above, demonstrates that the detective did not use any coercive techniques, deceptive tactics, psychological pressure or physical

#24411

punishment to obtain Cottier's confession. Likewise, it does not appear that

Cottier's mental or physical conditions made him overly susceptible to the pressures

of the interrogation. Consequently, the trial court did not err when it concluded,

based on the totality of the circumstances, that Cottier's statements were voluntary.

> **3)** **Whether the trial court erred by not admitting the entire video of Wesley Running's interrogation and the victim's prison record.**

[¶24.] Cottier offered the entire video of Running's interrogation under the

catchall/residual hearsay exception. SDCL 19-16-35.[4] He also offered Red Star's

prison record as character evidence under SDCL 19-12-4(2)[5] (Rule 404(a)), and as

---

4. SDCL 19-16-35 provides:
   > A statement not specifically covered by any of §§ 19-16-30 to 19-16-34, inclusive, but having equivalent circumstantial guarantees of trustworthiness, is not excluded by § 19-16-4 if the declarant is unavailable as a witness and if the court determines that:
   > (1) The statement is offered as evidence of a material fact;
   > (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
   > (3) The general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
   > However, a statement may not be admitted under this section unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

5. SDCL 19-12-4 (Rule 404(a)) provides:
   > Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
   > (1) Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

(continued . . .)

-14-

other acts evidence, under SDCL 19-12-5[6] (Rule 404(b)). This evidence was offered to demonstrate Red Star's propensity for violence, to corroborate Cottier's description of Red Star's tenacious attack and to justify Cottier's fear of Red Star. The court denied admission of both; however, it did permit the jury to view portions of Running's video taped interview.

[¶25.] We presume that evidentiary rulings by trial courts are correct. State v. Zakaria, 2007 SD 27, ¶22, 730 NW2d 140, 146. We review alleged errors under an abuse of discretion standard. *Id*. "An abuse of discretion refers to a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." State v. Beckley, 2007 SD 122, ¶20, 742 NW2d 841, 847 (citation omitted). Even if we find error, Cottier must demonstrate that the error was prejudicial to his case. "'Prejudicial error' is error which in all probability must have produced some effect upon the jury's verdict and is harmful to the substantial

_____

(. . . continued)
> (2) Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
> (3) Evidence of the character of a witness, as provided in §§ 19-14-8 to 19-14-16, inclusive.

6.    SDCL 19-12-5 (Rule 404(b)) provides:
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

rights of the party assigning it." State v. Krebs, 2006 SD 43, ¶19, 714 NW2d 91, 98 (citation omitted).

*Video tape of Wesley Running*

[¶26.]     When considering evidence proffered for admission under the residual hearsay exception, SDCL 19-16-35, "[t]he trial judge has both the obligation and the 'considerable discretion' to determine whether 'hearsay statements contain the necessary circumstantial guarantees of trustworthiness' to be admissible under this rule." State v. Engesser, 2003 SD 47, ¶38, 661 NW2d 739, 751 (noting that "[t]he preliminary question of trustworthiness, underlying the admissibility of 'catchall' hearsay statements, is a question for the court, rather than a question of weight for the jury"). The proponent of the evidence bears the "burden of establishing the trustworthiness requirement in [SDCL 19-16-35]." *Id.* ¶39, 661 NW2d at 752 (citation omitted).

[¶27.]     In *Engesser*, we set forth several factors for a trial court to consider in assessing trustworthiness of hearsay offered under the residual hearsay rule, these include:

> (1) the character of the witness for truthfulness and honesty and the availability of evidence on that question; (2) whether the testimony was given voluntarily, under oath, subject to cross-examination and a penalty for perjury; (3) the relationship of the witness to the parties and any motivation the witness had for making the statement; (4) the extent to which the witness's statement reflects personal knowledge; (5) whether the witness ever recanted the statement; (6) the existence of corroborating evidence; and (7) the reasons for the unavailability of the witness.

*Id.* ¶40, 661 NW2d at 752 (citations omitted). Although these factors are neither exhaustive nor mandatory, they provide guidance for an otherwise fact specific inquiry. *Id.*

[¶28.] Although Running was subpoenaed and other measures were taken to procure his testimony at trial, Running refused to attend. Therefore, as a substitute for his testimony, Cottier attempted to introduce the entire video taped interview of Running. The video tape portrayed Running being interviewed by a law enforcement officer the morning that Red Star's body was discovered. Cottier alleged that the video had "circumstantial guarantees of trustworthiness." *See* SDCL 19-16-35. The trial court denied admission of the entire video but permitted portions of the video to show Running's physical condition at the time of the interview. Ultimately, Running's statement that he argued with Red Star was not admitted because the trial court found that it lacked circumstantial guarantees of trustworthiness equivalent to those found in SDCL §§ 19-16-30 through 19-16-34. *See* SDCL 19-16-35.

[¶29.] At the time of the interview, Running was housed at a twenty-four hour detoxification facility. The night before the interview Running was picked up by law enforcement because he was too intoxicated to walk. Running was not under oath at the time, subject to cross-examination or subject to penalties of perjury. Based on these facts, the trial court did not abuse its discretion in determining that the videotaped interview lacked circumstantial guarantees of trustworthiness. Therefore, the trial court did not err in excluding portions of the video.

[¶30.]     Moreover, even if the trial court erred in not permitting the viewing of the entire video, the error did not prejudice Cottier. *See Krebs*, 2006 SD 43, ¶19, 714 NW2d at 98. Although the video shows Running discussing his shoulder injury as well as talking about a fight with someone, he does not implicate Red Star as the person he fought or even that a fight caused his shoulder injury. Cottier's purpose for wanting the entire video tape shown to the jury was to establish Cottier's reasonable fear of Red Star. Even without the Running video, Cottier was able to present evidence of Red Star's propensity for aggression through other witnesses. Scott Mertz, one of Red Star's acquaintances, testified that Red Star had a reputation for aggression and violence. Jerry Charger, another of Red Star's acquaintances, testified that Red Star was a mean drunk and a bully. Randy Deraad, the manager of the County Detoxification Center, testified that Red Star was unpredictable when intoxicated. And, finally, Cottier himself testified about his fear of Red Star, because of his reputation and propensity for violence. Even if the trial court erred in failing to admit the video, "the error was harmless as the evidence was cumulative of other evidence presented independently at trial." State v. Davi, 504 NW2d 844, 855 (SD 1993).

*Prison record of Red Star*

[¶31.]     Cottier contends the trial court violated his due process right by forbidding discussion of Red Star's prison record. *Packed*, 2007 SD 75, ¶27, 736 NW2d at 860 ("Those denied the ability to respond to the prosecution's case against them are effectively deprived of a 'fundamental constitutional right to a fair opportunity to present a defense.'") (citations omitted). According to Cottier, the

prison records would have "shown the aggressive and threatening nature of [Red Star], and the reasonableness of [Cottier's] response to [Red Star's] aggression." When the trial court denied admission of this evidence, Cottier claims to have lost the opportunity to "present a complete defense." *See Packed*, 2007 SD 75, ¶27, 736 NW2d at 860 (citations omitted). Cottier offered the evidence pursuant to SDCL 19-12-4(2)[7] (Rule 404(a)) and SDCL 19-12-5[8] (Rule 404(b)).

[¶32.] SDCL 19-12-5 (Rule 404(b)) allows admission of specific act(s) "for purposes other than to show conduct in conformity with character." 2 Weinstein's Federal Evidence § 404.12[3] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed 2007) (discussing Rule 404(b)); SDCL 19-12-5 (Rule 404(b)). Here, Cottier offered the prison record to corroborate his "story of how [Red Star] attacked [Cottier]" because it demonstrated how "[Red Star] keeps coming and keeps coming." He

---

7. SDCL 19-12-4 (Rule 404(a)) provides:
> Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
> (1) Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
> (2) Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
> (3) Evidence of the character of a witness, as provided in §§ 19-14-8 to 19-14-16, inclusive.

8. SDCL 19-12-5 (Rule 404(b)) provides:
> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

claimed the evidence would have shown "[Red Star's] tendency to violence" and "[Cottier's] reasonableness of fear." Essentially, Cottier attempted to argue Red Star's actions on the night of the attack conformed to previous specific behavior. This purpose is expressly prohibited under SDCL 19-12-5 (Rule 404(b)) (stating "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith").

[¶33.] SDCL 19-12-4(2) (Rule 404(a)) permits evidence of a victim's violent propensities through reputation and opinion evidence. "[T]he purpose of introducing victim character evidence is to show that the victim had a propensity for violence and thus is more likely to have been using unlawful force at the time of the crime." 2 Weinstein's Federal Evidence § 404.11[3][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed 2007). "[I]f it is established that the accused knew of the victim's violent character, evidence of the victim's character may be offered not only to show that the victim acted in conformity with that character, but also to establish the accused's justifiable apprehension and the reasonableness of his or her defensive measures." *Id.* However, evidence of the victim's specific acts, like the prison records of Red Star or discussion of specific incidents of violence, are not admissible to prove the victim acted in conformity therewith. *Id.*; SDCL 19-12-5; *see also* State v. Knecht, 1997 SD 53, ¶15, 563 NW2d 413, 419 (quoting State v. Latham, 519 NW2d 68, 71 (SD 1994)). Nonetheless, a victim's specific acts may be admissible to demonstrate a defendant's state of mind, but only if the acts were known to the defendant at the time of the offense. *Weinstein's, supra* at §§ 404.11[3][a], 405.05[4] (noting that although specific acts of violence may not be

used to prove the victim's violent propensities, "specific acts . . . known to the defendant at the time of the offense may be admissible to prove the defendant's state of mind"); *see also Knecht,* 1997 SD 53, ¶15, 563 NW2d at 419 (quoting *Latham*, 519 NW2d at 71 (citation omitted) (noting that specific instances of the victim's violent conduct are relevant only if "known to [defendant] at the time of the incident")). Cottier failed to establish that he was aware of these specific acts at the time of the offense.

[¶34.] Cottier has failed to show that the trial court abused its discretion when it prohibited the admission of Red Star's prison record.

[¶35.] We affirm on all issues.

[¶36.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and ZINTER, Justices, concur.