2015 S.D. 7

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Jesse JOHNSON, Defendant and Appellant.**

No. 26803.

Supreme Court of South Dakota.

Argued Nov. 17, 2014.

Decided Feb. 4, 2015.

Appeal from the Circuit Court of the Seventh Judicial Circuit, Pennington County, South Dakota; Janine Kern, Judge.

Marty J. Jackley, Attorney General, Caroline A. Srstka, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Alecia E. Fuller, Pennington County Public, Defender's Office, Rapid City, South Dakota, Attorneys for defendant and appellant.

GILBERTSON, Chief Justice.

[¶ 1.] After a jury trial from June 4, 2013, to June 7, 2013, in Rapid City, Pennington County, South Dakota, a jury convicted Defendant Jesse Johnson of first-degree rape, aggravated incest, and sexual contact with a child under age 13. Defendant appeals asserting that the circuit court improperly determined Defendant's interview was noncustodial, it improperly ruled Defendant's confession was voluntary and admissible, it abused its discretion in allowing certain expert testimony, it violated Defendant's Fifth Amendment Double Jeopardy rights, the jury lacked sufficient evidence to sustain its verdict, and the State failed to disclose exculpatory evidence. We affirm in part and remand in part.

**Facts and Procedural History**

[¶ 2.] Defendant is prelingually deaf. Defendant was married to and cohabitated with J.D., who is also deaf, and J.D.'s daughter, K.J., for the past several years. Defendant helped J.D. raise K.J. On January 29, 2012, K.J. told J.D. that Defendant had made K.J. watch pornography, he had sexually assaulted her, and he raped her. K.J., then seven years old, told J.D. that Defendant's conduct had occurred several times between May 2010 and September 2010 when K.J. was six years old. J.D. had a friend come over and call the police. The police scheduled a forensic interview for K.J. with the Child Advocacy Center in Rapid City on February 6, 2012. At the forensic interview, K.J. said that Defendant showed her pornography, had her touch his penis, and penetrated her vagina. The interview was recorded.

[¶ 3.] Later on February 6, 2012, Investigator Ed Schulz asked Defendant to come to the Rapid City Public Safety Building for a noncustodial interview. Defendant was the only suspect when Investigator Schulz requested the interview. Investigator Schulz also dispatched for an interpreter. Katie Peterson, a Level III Certified Transliterator, was hired by the Pennington County Sheriff's Office to interpret the interview. Peterson had worked with Defendant on several occasions over the past three years, but never in a legal setting. Schulz had never worked with Peterson before nor had he ever interviewed a deaf suspect. Schulz

explained to Peterson what Defendant was being accused of prior to the interview and that the interview would be recorded. When Defendant arrived, he and Peterson conversed about their families and made other small talk. The two conversed using a blend of American Sign Language (ASL) and signed English.[1]

[¶ 4.] Investigator Schulz brought Defendant and Peterson into an interview room in the Public Safety Building and shut the door for privacy purposes, but left it unlocked. Schulz did not advise Defendant of his *Miranda* rights. Once everyone was seated, Schulz began by informing Defendant that the interview was noncustodial. Schulz read a prepared, written statement, and Peterson interpreted it to Defendant. The prepared statement said:

> Jesse, whenever I talk with people, I need to explain a few things. This will be a noncustodial interview. You are not under arrest and you are not being detained. You don't have to talk with me, if you don't want to. The door is shut for privacy purposes and unlocked. At any time you feel you don't want to talk anymore, you can leave. No matter what you tell me, I'm not arresting you today.
> Do you understand what I just explained to you?
> Do you have any questions?

Once Schulz read the statement to Defendant, Schulz asked if Defendant had any questions. The interpreter told Schulz that the Defendant signed, "I guess I don't know what the point is, like when we're finished, then what happens?" Schulz responded, "When we're finished and I will explain the whole process of what's going on and I will answer those questions as the interview progresses for you." Schulz then had Defendant read the statement to himself. Schulz asked, "Do you understand? Yes or no?" and then he pointed to the paper. On the paper that Schulz read to Defendant and Defendant read for himself, Defendant wrote his initials, "JJ," next to the first question of "Do you understand what I just explained to you?" Next to the second question—"Do you have any questions?"—Defendant wrote "no."

[¶ 5.] The noncustodial interview lasted about 2 hours and 45 minutes. For about the first hour or so, Defendant resisted Schulz's questions and did not confess to any sexual touching of K.J. Schulz controlled the interview and utilized techniques of interrogation from the Reed School and others, but he did not threaten or deceive Defendant. Schulz would say things like, "I know it happened," "I need you to tell me the truth," and "I know it's tough to talk about but I can see it all over your face." Defendant appeared to know and understand what Schulz was talking about and even asked questions of Schulz.

[¶ 6.] At about one hour into the interview, Schulz told Defendant he was going to execute a search warrant on Defendant's cellphone to see if he could uncover any photos. Defendant gave his permission and said that the police would not find anything on his phone. However, shortly before Schulz executed the search, Defendant admitted that K.J. had seen pornographic images, Defendant allowed her to touch his penis, and he had penetrated K.J. with his finger. At the conclusion of the interview, the police executed the search warrant on Defendant's phone, and he was allowed to go free. An arrest

---

1. American Sign Language is its own, recognized language. It has its own lexicon and syntactic structure. ASL is not merely a derivative or manual form of spoken English. Signed English follows English sentence structure and, for the most part, is a manual form of English.

warrant was issued on February 10, 2012, and the police arrested Defendant that day.

[¶ 7.] Defendant was indicted for first-degree rape, aggravated incest, and sexual contact with a child under 13 on February 23, 2012. On March 5, 2012, Defendant was arraigned and pleaded not guilty. On September 14, 2012, Defendant filed a motion to suppress his confession on February 6, 2012, arguing that he was in custody at the time and the confession was not voluntary. The circuit court held three evidentiary hearings on November 9, November 28, and December 13, of 2012. The State called Investigator Schulz and Katie Peterson, the interpreter, as witnesses. Schulz testified about the interview and what Defendant had confessed to him. Peterson testified that she worked for Communication Services for the Deaf (CSD), a nonprofit agency assisting the deaf in South Dakota and the United States. Peterson received her Bachelor's degree in sign language interpreting and holds a Certificate of Transliteration (CT) from the Registry of Interpreters for the Deaf (RID). She is registered with the South Dakota Department of Human Services required by law. Peterson testified that her certification qualifies her to interpret in the court system. Peterson acknowledged that she was not ASL certified at the time of the interview and that a Certificate of Transliteration is intended to be used more with individuals who use

signed English rather than ASL. However, Peterson testified that she studied ASL as an undergraduate and that the blend of ASL and signed English used by her and Defendant had worked well over the previous three years. They had worked together in job interviews and counseling sessions in those three years. Defendant had never expressed any concern to her or CSD regarding her skills or proficiency as an interpreter.

[¶ 8.] Defendant called two expert witnesses at the suppression hearings, Anna Witter–Merithew and Dr. Steven Manlove. Defendant did not testify. Ms. Witter–Merithew holds a variety of degrees and certifications, including a specialty in legal interpreting, and has published over 30 books and articles. She interviewed Defendant for over five hours using interactive video conferencing and reviewed the video footage from the noncustodial interview. She produced a 33–page report containing her findings, conclusions, and opinion. Based on her observations of the video footage, she testified that Peterson was fluent in terms of the clarity of her signs, the conversation was English based, and the interpreter provided a transliteration, not an interpretation.[2] Ms. Witter–Merithew also opined that the interpreter worked for a long period of time without a break and certain errors were made. Ms. Witter–Merithew opined that the legal concepts of "noncustodial" and "detained" were not clearly established. She said

---

2. A transliteration is different than an interpretation.

The most English form of interpretation is known as transliteration. Transliteration is the means by which spoken English is converted word for word into visual English. . . .

Transliteration conveys the words being spoken. It does not decode the spoken English—that is, it does not get to the meaning. Rather, it recodes the English, making the spoken word visible, either in signing form or orally. Oral transliteration is a type of interpretation in which the interpreter repeats the words of the speaker verbatim. Signing transliteration utilizes manually coded English and reproduces the words via hand signs and finger-spelling. *State v. Wright*, 2009 S.D. 51, ¶ 44 n. 10, 768 N.W.2d 512, 527 n. 10 (quoting Michele LaVigne & McCay Vernon, *An Interpreter Isn't Enough: Deafness, Language, and Due Process*, 2003 Wis. L.Rev. 843, 870–71 (2003)).

these concepts needed to be interpreted in ASL, Defendant's primary language, and not merely transliterated. Ms. Witter–Merithew thought the transliteration did not provide an adequate advisement of the conditions surrounding the interview, and that the interpreter did not observe best practices. Ms. Witter–Merithew believed that a reasonable deaf person would not have felt free to leave under the circumstances.

[¶ 9.] Dr. Manlove, a forensic psychiatrist, also testified for Defendant. Dr. Manlove testified that Defendant had an average IQ of 93 and a low-average verbal IQ of 86. Dr. Manlove thought that Defendant had the cognitive ability to understand the warning given by Investigator Schulz regarding the noncustodial nature of the interview. Dr. Manlove did not think Investigator Schulz had coerced Defendant in any kind of direct way, but he thought the language difference provided an unintended coercive element to the interview. As a result, Dr. Manlove opined Defendant's ability to meaningfully understand his rights was compromised during the interrogation due to his deafness, expectations placed on him by the deaf culture, his reliance on an interpreter to understand verbal language, his need to trust what the interpreter was relaying to him, and his reliance on interpretations and body language to understand what was happening. Dr. Manlove further testified that Defendant's ability to waive his rights and to understand what he was waiving was also compromised. Dr. Manlove testified that only with the help of excellent interpretation could Defendant competently understand the nature of the proceedings against him.

[¶ 10.] At the conclusion of the suppression hearings on December 13, 2012, the circuit court re-arraigned Defendant because it was Peterson who initially interpreted the arraignment on March 5, 2012, and Defendant had raised an issue with Peterson's qualifications. Defendant again pleaded not guilty to all charges. On March 22, 2013, following the evidentiary hearings, the circuit court issued a memorandum opinion, concluding that the interview was noncustodial and Defendant voluntarily confessed. The circuit court relied heavily on the fact that Schulz had first read the prepared statement to Defendant, Peterson translated it to Defendant, Defendant had a chance to read it himself, he indicated that he understood it, and did not have any questions about it.

[¶ 11.] The circuit court held a jury trial from June 4, 2013, to June 7, 2013. The jury found Defendant guilty of first-degree rape under SDCL 22–22–1(1), guilty of sexual contact with a child under 13 pursuant to SDCL 22–22–7, and guilty of aggravated incest under SDCL 22–22A–3. On August 14, 2013, Defendant was sentenced on all counts, receiving 40 years for first-degree rape, 15 years for sexual contact with a child, and 15 years for aggravated incest with all sentences to run concurrently. Judgment was filed on August 19, 2013. Defendant appeals.

[¶ 12.] He raises six issues in this appeal:

1. Whether the circuit court erred when it determined that Defendant was not in custody during the interview on February 6, 2012.

2. Whether the circuit court erred when it determined that Defendant's interview statements were voluntary.

3. Whether the circuit court abused its discretion in allowing Dr. Leslie Fiferman to testify at trial.

4. Whether Defendant's Fifth Amendment Double Jeopardy rights were violated.

5. Whether the circuit court properly denied Defendant's motion for judgment of acquittal.

6. Whether the State's failure to provide certain evidence to Defendant was prejudicial requiring a new trial.

### Decision

[¶ 13.] 1. *Whether the circuit court erred when it determined that Defendant was not in custody during the interview on February 6, 2012.*

#### Standard of Review

[¶ 14.] Defendant's contention that he was in custody during the interview on February 6, 2012, amounts to a constitutional challenge under the Fifth Amendment because the "right against self-incrimination is implicated whenever an individual is subject to custodial interrogation by law enforcement." *State v. Walth,* 2011 S.D. 77, ¶ 10, 806 N.W.2d 623, 625 (quoting *State v. Bowker,* 2008 S.D. 61, ¶ 26, 754 N.W.2d 56, 64) (internal quotation mark omitted). On a motion to suppress, "we review findings of fact under the clearly erroneous standard." *State v. Wright,* 2009 S.D. 51, ¶ 18, 768 N.W.2d 512, 519 (quoting *State v. Ball,* 2004 S.D. 9, ¶ 21, 675 N.W.2d 192, 199) (internal quotation mark omitted). "Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *Id.* (footnote omitted) (quoting *Ball,* 2004 S.D. 9, ¶ 21, 675 N.W.2d at 199) (internal quotation mark omitted).

#### Analysis of Issue 1

[¶ 15.] It is undisputed that Defendant was not given the *Miranda* warning at any time during the interview on February 6, 2012. "Police officers are not, however, required to administer *Miranda* warnings to everyone whom they question[;] . . . *Miranda* warnings are required only when there is a custodial interrogation." *Id.* ¶ 19, 768 N.W.2d at 520 (citations omitted) (quoting *State v. Aesoph,* 2002 S.D. 71, ¶ 17, 647 N.W.2d 743, 751) (internal quotation marks omitted). We explained in a different *State v. Johnson* that interviews with law enforcement will naturally have coercive pressures, but *Miranda* warnings are only required when a suspect is in custody:

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. Nor is the requirement of warning to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.'

*State v. Johnson,* 2007 S.D. 86, ¶ 22, 739 N.W.2d 1, 9 (quoting *State v. Thompson,* 1997 S.D. 15, ¶ 25, 560 N.W.2d 535, 540). We use a two-part test to determine whether or not someone is in custody:

First, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Wright,* 2009 S.D. 51, ¶ 19, 768 N.W.2d at 520 (quoting *Johnson,* 2007 S.D. 86, ¶ 22, 739 N.W.2d at 9).

 [¶ 16.] Defendant first asserts the circumstances surrounding the interview were such that a reasonable person in Defendant's position would not feel free to leave and, in turn, militate in favor of Defendant being in custody. In *State v. Wright,* we also decided whether or not a deaf defendant was in custody for Fifth Amendment purposes. *Wright,* 2009 S.D. 51, ¶¶ 19–26, 768 N.W.2d at 520–22. We determined the circumstances in *Wright* did not militate in favor of concluding Wright was in custody. *Id.* There are numerous similarities between this case and *Wright:* both defendants are prelingually deaf; an interpreter was used during the interview; both were interviewed for around two and half hours; both voluntarily came to the police station house for questioning; both were told they were free to leave at any time; neither were restrained; in both instances, the door was shut · for privacy purposes, but remained unlocked; both were aware the door was unlocked; and a search warrant was executed after the interview. *See id.* ¶¶ 20–22, 768 N.W.2d at 520–21. In addition, both Wright and Defendant Johnson argued on appeal "that [they] did not feel free to leave, [they] felt tremendous negative pressure, and [they] felt that [they] had no choice but to participate in the interview." *Id.* ¶ 20, 768 N.W.2d at 520 (internal quotation marks omitted). We have consistently said, "[S]ubjective thoughts are not a proper basis for the determination of whether [a person] was in custody." *Id.* (quoting *State v. Myhre,* 2001 S.D. 109, ¶ 18, 633 N.W.2d 186, 190). "The determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogation officers or the person ·being questioned." *Id.* (quoting *State v. Herting,* 2000 S.D. 12, ¶ 9, 604 N.W.2d 863, 865). Thus, Defendant's subjective feelings are not controlling. ·

 [¶ 17.] Beyond the similarities to *Wright,* Defendant points out that he was the sole suspect at the time of the interview. In determining whether *Miranda* warnings are necessary, the test "is not whether the investigation has focused on any particular suspect, but rather, whether the person being questioned is in custody or deprived of his or her freedom to leave." *Walth,* 2011 S.D. 77, ¶ 15, 806 N.W.2d at 626 (quoting *Johnson,* 2007 S.D. 86, ¶ 22, 739 N.W.2d at 9) (internal quotation marks omitted). "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Id.* (quoting *Thompson,* 1997 S.D. 15, ¶ 25, 560 N.W.2d at 540) (internal quotation marks omitted). Although Defendant was the prime suspect, Schulz told Defendant he could leave, and Defendant· read the statement for himself. The statement clearly specified that Defendant was free to leave at any time and was not under arrest. Defendant initialed that he understood he was free to leave. Thus, the fact that Defendant was the prime suspect is not dispositive.

[¶ 18.] Defendant's primary argument favoring a determination that he was in custody at the time of his interview on February 6, 2012, is that he was not told *in a meaningful way* that he could leave. Because his right to leave was not meaningfully communicated to him, Defendant asserts Investigator Schulz effectively deprived him of his freedom to leave. The circuit court ruled in its memorandum opinion that Defendant was not in custody on February 6. Defendant takes issue with the circuit court's memorandum opinion and subsequent findings on several fronts.

[¶ 19.] First, Defendant argues that the interpreter, Katie Peterson, was not qualified. Defendant argues that, while Peterson claimed to be ASL certified, she in fact was not. Peterson had received ASL certification, but let it expire in 2004. It is true that Peterson was not ASL certified. The certification Peterson had at the time of the interview was a Level III Certificate of Transliteration. That certification allows an interpreter to interpret in

> [a]ny criminal proceeding, any interrogation by law enforcement which could result in a criminal charge, any arrest or booking at a police station, any meeting with a probation or parole officer, any meeting with an attorney relating to a potential criminal charge or proceeding, any deposition relating to a potential criminal charge or proceeding, and any grand jury proceeding[.]

ARSD 46:31:06:02(1). Clearly, South Dakota law permits someone of Peterson's qualifications to interpret in a proceeding like Defendant's interview. *See id.* In addition, the circuit court found Defendant and Peterson had worked together for the past three years and Defendant never complained about the mix of ASL and English sign used by the pair.

[¶ 20.] Defendant counters that while Peterson may be certified in transliteration, she made numerous errors that deprived Defendant of the right to leave. Particularly, Defendant argues the circuit court erroneously placed great significance on the fact that Schulz read, and the interpreter interpreted, the prepared, written statement explaining what a noncustodial interview was. Defendant's expert, Ms. Witter–Merithew, testified that Peterson misinterpreted Defendant's question about what happens when the interview finishes.[3] Defendant asserts his question was an immediate question to terminate the interview. This misinterpretation, according to Defendant, was tantamount to a deprivation of Defendant's right to leave. However, Defendant's own expert acknowledged, and the circuit court found as a matter of fact, that Defendant's question could be construed in several different ways. The circuit court found that Defendant did not express a definitive request to leave. We defer to the circuit court's findings of fact in this matter. After watching the interview and reviewing the record, we conclude that the circuit court's findings of fact were not clearly erroneous. Thus, Defendant's argument that his inquiry was a definitive request to terminate the interview is not supported by the evidence.

[¶ 21.] Defendant relies heavily on Ms. Witter–Merithew's opinion to point out that Peterson made other semantic and syntactic errors during the interview. The circuit court acknowledged in its memorandum opinion that certain errors were made in the interview. However, after Peterson signed the statement to Defendant, Defendant read the statement for himself. The Defendant's other expert, Dr. Manlove, opined that Defendant had the cognitive ability to understand the statement. The circuit court found that Defendant understood the statement. Defendant did not express to Schulz or the interpreter that

---

**3.** Defendant asserts he stated a specific question as to whether he was truly free to leave and was met with a brush off. Defendant contends that he signed, "If we finished, then what?" not, "I guess I don't know what the point is, like when we're finished, then what happens?" Because Defendant's question was arguably an immediate question to terminate the interview and not a conditional question about what would happen at the end of the interview, Defendant argues that Schulz should have stopped the interview and limited his questioning to clarifying Defendant's response. *See State v. Tuttle*, 2002 S.D. 94, ¶ 14, 650 N.W.2d 20, 28.

he did not know what the statement said. To the contrary, Defendant indicated on the statement form that he understood the statement and did not have any questions about it. Defendant resisted Schulz's questions for over an hour, Defendant was not restrained, the door was unlocked, the interview was conversational in nature, Defendant was not arrested after the interview, and Schulz drove Defendant back to his hotel at the conclusion of the interview. Based on the circumstances surrounding the interview, we conclude that a reasonable person would have felt free to terminate the interview and leave. Therefore, we affirm the circuit court's ruling and hold the interview was noncustodial.

[¶ 22.] 2. *Whether the circuit court erred when it determined that Defendant's interview statements were voluntary.*

*Standard of Review*

 [¶ 23.] Defendant also claims that Investigator Schulz was coercive, and that under the totality of the circumstances, especially considering his prelingual deafness, his statements to Schulz were involuntary. "When examining the voluntariness of a confession, this Court considers the totality of the circumstances, giving deference to the trial court's factual findings, but performing a de novo review of the record, and making an independent determination of the ultimate issue of voluntariness." *Wright,* 2009 S.D. 51, ¶ 32, 768 N.W.2d at 523 (quoting *State v. Carothers,* 2006 S.D. 100, ¶ 23, 724 N.W.2d 610, 619) (internal quotation marks omitted).

*Analysis for Issue 2*

 [¶ 24.] Many of the same factors and circumstances leading to our determination that the interview on February 6, 2012, was noncustodial inform our analysis of voluntariness. "Ultimately, the voluntariness of a confession depends on the absence of police overreaching.... Confessions are not deemed voluntary if, in light of the totality of the circumstances, law enforcement officers have *overborne the defendant's will.*" *Id.* ¶ 32, 768 N.W.2d at 524 (quoting *State v. Cottier,* 2008 S.D. 79, ¶ 19, 755 N.W.2d 120, 128) (emphasis added) (internal quotation marks omitted). It is the State's burden to establish voluntariness by a preponderance of the evidence. *Id.* To determine whether Defendant's will was overborne, we look at multiple factors, including:

(1) the conduct of law enforcement officials in creating pressure and (2) the suspect's capacity to resist that pressure. On the latter factor, we examine such concerns as the defendant's age; level of education and intelligence; the presence or absence of any advice to the defendant on constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of psychological pressure or physical punishment, such as deprivation of food or sleep; and the defendant's prior experience with law enforcement officers and the courts. Finally, [d]eception or misrepresentation by the officer receiving the statement may also be factors for the trial court to consider; however, the police may use some psychological tactics in interrogating a suspect.

*Id.* ¶ 33, 768 N.W.2d at 524 (quoting *Cottier,* 2008 S.D. 79, ¶ 19, 755 N.W.2d at 129).

 [¶ 25.] Defendant argues Investigator Schulz created pressure during the interview. This pressure was compounded because of Peterson's interpretation errors, Defendant's belief that Peterson was aligned with Schulz, Peterson constantly nodding her head as if to approve everything Defendant signed, Schulz verbally "dominating" the conversation, Schulz's

employment of Reed School interrogation techniques, Schulz's accusatory tone, Defendant being the only suspect, and some of the other circumstances outlined in the above custodial analysis. Again, Defendant's primary contention is that he was not told that he could leave in a meaningful way. Because he was not properly informed he could leave, his confession was not voluntary. Both Ms. Witter–Merithew and Dr. Manlove opined that Defendant did not voluntarily confess based on the totality of the circumstances. Thus, Defendant contends Schulz and Peterson overreached and overbore on Defendant's will.

[¶ 26.] We look to the circuit court's findings of fact to determine whether Defendant's statements were voluntary. *See id.* ¶ 34, 768 N.W.2d at 524. The circuit court found, with regard to Schulz's conduct, that:

(1) Schulz informed Defendant the interview would be noncustodial.

(2) The interview was conducted in the Public Safety Building on the third floor.

(3) The door to the interview room was closed for privacy purposes but unlocked.

(4) Schulz told Defendant the door was unlocked.

(5) Schulz read, and Peterson interpreted, the statement that the interview would be noncustodial.

(6) Defendant read the statement.

(7) Schulz indicated to Defendant he was free to leave and Schulz would not arrest Defendant that day.

(8) Defendant indicated he understood the statement and marked that he did not have any questions.

(9) Schulz did not threaten Defendant.

(10) The interview was conversational in nature.

(11) Schulz was not deceitful, overly coercive, or physically aggressive with Defendant.

(12) Schulz used Reed School interrogation techniques on Defendant and applied psychological pressure.

(13) Schulz testified Defendant appeared to understand what Schulz was talking about.

(14) The interview lasted about 2 hours and 45 minutes.

(15) After the interview, Schulz did not arrest Defendant that day.

(16) Schulz executed a search warrant after the interview.

(17) Schulz drove Defendant back to his hotel.

These facts indicate that while Schulz created some pressure on Defendant, Schulz's conduct did not overbear Defendant's will. Based on our review of the interview and record, we cannot say that any of these factual findings are clearly erroneous.

[¶ 27.] We also look at Defendant's capacity to resist law enforcement's pressure. Defendant was 32 years old at the time of the interview, he graduated from high school, and he attended Wyoming Technical School for a few years. Dr. Manlove testified that Defendant had an average IQ of 93 and a low-average verbal IQ of 86. Defendant often communicated through text messages. Defendant had held nine different jobs over the course of his lifetime and had been at his latest job for 14 months. Defendant indicated that he read and understood that he was free to leave the interview at any time. Defendant's own expert, Dr. Manlove, testified Defendant had the capacity to understand the statement. The interpreter was certified to translate the proceeding and had worked with Defendant over the past three years. Defendant at no time indicated that he did not understand the interpreter.

Defendant was not deprived of sleep or food during the interview, which lasted only a couple hours. Defendant had experience with the legal system before, having been arrested for DUI in 1999, 2007, and 2011, domestic violence in 2011, and been convicted of several misdemeanors. While Schulz applied Reed School techniques and psychological pressure, Defendant resisted Schulz for over an hour and demonstrated that he could resist Schulz if he chose to do so.

[¶ 28.] A review of the interview video also supports a conclusion that the circuit courts findings of fact were not clearly erroneous. The interview was generally conversational in nature. Schulz was not overly coercive or deceitful and never made any physically aggressive moves towards Defendant. While Schulz applied some pressure on Defendant, "the police may use some psychological tactics in interrogating a suspect." *Id.* ¶ 33, 768 N.W.2d at 524 (quoting *Cottier*, 2008 S.D. 79, ¶ 19, 755 N.W.2d at 129). The State met its burden in proving by a preponderance of the evidence that Defendant's will was not overborne. We, therefore, hold that based on the totality of the circumstances and giving deference to the circuit court's findings of fact, the circuit court did not err in concluding Defendant's statements were voluntary.

[¶ 29.] 3. *Whether the circuit court abused its discretion in allowing Dr. Leslie Fiferman to testify.*

### Standard of Review

[¶ 30.] Circuit courts have broad discretion to determine "the qualification of expert witnesses and the admission of their testimony." *State v. Kvasnicka*, 2013 S.D. 25, ¶ 18, 829 N.W.2d 123, 128 (quoting *State v. Running Bird*, 2002 S.D. 86, ¶ 38, 649 N.W.2d 609, 617) (internal quotation mark omitted). "We review a [circuit] court's decision to admit or deny an expert's testimony under the abuse of discretion standard." *Id.* (quoting *State v. Lemler*, 2009 S.D. 86, ¶ 18, 774 N.W.2d 272, 278) (internal quotation marks omitted).

### Analysis of Issue 3

[¶ 31.] Defendant contends the circuit court abused its discretion in allowing Dr. Fiferman to testify. SDCL 19–15–2 (Rule 702) governs the testimony of experts. SDCL 19–15–2 (Rule 702) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data,
>
> (2) The testimony is the product of reliable principles and methods, and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

Defendant claims the 2011 changes to SDCL 19–15–2 (Rule 702) now require the expert witness be familiar with the facts of the case and apply his or her expertise to those facts. *Compare* SDCL 19–15–2 (Rule 702) (2004) *amended by* 2011 S.D. Sess. Laws ch. 235 (Supreme Court Rule 10–11), *with* SDCL 19–15–2 (Rule 702). Dr. Fiferman admitted he did not know the facts of the case, he did not study the case, and was not asked to do so by the State. Thus, according to Defendant, Dr. Fiferman, by his own admission, could not testify as an expert witness because he did not meet the requirements of SDCL 19–15–2 (Rule 702).

[¶ 32.] SDCL 19–15–2 (Rule 702) employs the same language as the 2000 version of Fed.R.Evid. 702. *Compare* SDCL 19–15–2 (Rule 702) *with* Fed.R.Evid. 702 (2000) *amended by* Fed.R.Evid. 702 (2011). The 2000 version of Fed.R.Evid. 702 was "amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and to the many cases applying *Daubert,* including *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)." Fed.R.Evid. 702 advisory committee's note, 2000 amend. Thus, by its plain language, SDCL 19–15–2 (Rule 702) is coextensive with Fed.R.Evid. 702 (2000), which in turn incorporates the standards set forth in *Daubert. See State v. Yuel,* 2013 S.D. 84, ¶ 8, 840 N.W.2d 680, 683 ("South Dakota has adopted the *Daubert* test[.]"). This Court has repeatedly held the Federal Rules are to be treated in the same manner as a uniform rule to provide us with assistance in the interpretation of our rule when it is the same or similar to a Federal Rule. *See Miller v. Hernandez,* 520 N.W.2d 266, 269 (S.D. 1994); *State v. Wright,* 1999 S.D. 50, ¶ 13 n. 4, 593 N.W.2d 792, 798 n. 4; *In re S.D. Microsoft Antitrust Litig.,* 2003 S.D. 19, ¶ 8 n. 4, 657 N.W.2d 668, 672 n. 4.

[¶ 33.] Under *Daubert,* perhaps the most important consideration in determining the admissibility of expert testimony is whether the testimony is helpful to the jury in resolving issues of fact. *See Daubert,* 509 U.S. at 591–92, 113 S.Ct. at 2795–96. To that end, an expert's testimony may be admissible even if the expert's sole function is "to educate the factfinder about general principles, without ever attempting to apply [those] principles to the specific facts of the case." *State v. Salazar–Mercado,* 234 Ariz. 590, 325 P.3d 996, 999 (2014) (quoting Fed.R.Evid. 702 advisory committee notes, 2000 amend.) (internal quotation marks omitted). "For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by the expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." Fed.R.Evid. 702 advisory committee notes, 2000 amend.

[¶ 34.] In this case, the circuit court determined Dr. Fiferman was qualified because of his education, training, and experience—Dr. Fiferman had testified over 50 times before the court. The circuit court further found his testimony would assist the trier of fact regarding delayed reporting, "grooming," and the psychological effects of sexual abuse. The circuit court finally determined Dr. Fiferman's testimony was reliable and fit the facts of the case. Indeed, we have previously recognized, "Expert testimony explaining the general characteristics of sexually abused children is admissible when relevant." *State v. Cates,* 2001 S.D. 99, ¶ 19, 632 N.W.2d 28, 36. The circuit court found Dr. Fiferman's testimony to be relevant. Therefore, the circuit court did not abuse its discretion in allowing Dr. Fiferman to testify.

[¶ 35.] 4. *Whether Defendant's Fifth Amendment Double Jeopardy rights were violated.*

*Analysis of Issue 4*

[¶ 36.] We review claims of double jeopardy violation under the de novo standard of review. *Id.* ¶ 6, 632 N.W.2d at 33. The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, declares that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The South Dakota Constitution provides the same protection. S.D. Const. art. VI, § 9. Double jeopardy

"protects against three types of governmental abuses: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense." *State v. Garza,* 2014 S.D. 67, ¶ 10, 854 N.W.2d 833, 837 (quoting *Johnson,* 2007 S.D. 86, ¶ 12, 739 N.W.2d at 6). We said in *Garza* that "the determination of whether the same criminal act can be punished under two separate statutes in one trial is a question of state law to be determined by the courts." *Id.* ¶ 11 (citing *Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983)). Defendant asserts that he faces multiple punishments for the same offense. He contends both the first-degree rape and the aggravated incest charges were predicated on only one act of sexual penetration. Thus, Defendant maintains he is twice put in jeopardy for the same criminal offense.

[¶ 37.] To determine whether multiple punishments are constitutionally permissible, we look at legislative intent. *Id.* (citing *Hunter,* 459 U.S. at 365–66, 103 S.Ct. at 678). The legislative intent is clear in this matter. The distinction between rape and incest as historically different crimes goes back to our earliest criminal code and has been maintained to the present day. In 1877 the crime of rape was placed in chapter XXVI of the Penal Code, Penal Code, ch. 26, § 320 (1877), while incest was placed in chapter XXXI dealing with inter-family crimes such as bigamy, incest, and unlawful marriages, Penal Code, ch. 31, § 345 (1877). In the next iteration of the South Dakota Penal Code (1903), the Legislature maintained the distinction, codifying rape in chapter 26 with other like crimes and incest in chapter 31 with other inter-family crimes. Penal Code, ch. 26, § 325 (1903); Penal Code, ch. 31, § 350 (1903). Again,

in the 1919 South Dakota Revised Code, rape was codified with "Crimes Against the Person" in chapter 11, § 4092, and incest was codified with "Crimes Against Conscience and Morality" in chapter 2, article 2, § 3864. S.D. Revised Code tit. 4, pt. 3, ch. 11, § 4092 (1919); S.D. Revised Code tit. 4, pt. 2, ch. 2, art. 2, § 4092 (1919). In 1939, the Legislature codified rape with other "Crimes Against the Person," while incest was codified with "Crimes Against the Public Morals"; thus, the distinction between the crimes was again made. *See* SDC tit. 13, pt. III, § 13.2801 (1939); SDC tit. 13, pt. II, § 13.1715 (1939). The present iteration of South Dakota Codified Law maintains the distinction. *See* SDCL 22–22–1; SDCL 22–22A–2; SDCL 22–22A–3; SDCL 22–22A–3.1. Rape, codified at SDCL 22–22–1, is in SDCL chapter 22–22, which is entitled "Sex Offenses." Incest is codified at SDCL 22–22A–2, which is part of the chapter entitled "Offenses Against the Family." The Legislature's intent is clear; rape and incest are, and have always been, separate offenses under South Dakota law. Because legislative intent is clear, we do not need to perform a *Blockburger* analysis to ascertain legislative intent. *See Garza,* 2014 S.D. 67, ¶ 13, 854 N.W.2d at 838 (stating that we employ *Blockburger* when the legislative intent is unclear). We affirm the circuit court's imposition of multiple punishments.

[¶ 38.] 5. *Whether the circuit court properly denied Defendant's motion for judgment of acquittal.*

*Analysis of Issue 5*

[¶ 39.] The Court reviews the denial of motion for judgment of acquittal de novo. *State v. Hauge,* 2013 S.D. 26, ¶ 12, 829 N.W.2d 145, 149. This Court determines "whether the evidence was sufficient to sustain the conviction." *Id.* (quoting *State v. Janklow,* 2005 S.D. 25,

¶ 16, 693 N.W.2d 685, 693) (internal quotation marks omitted). "Claims of insufficient evidence are viewed in the light most favorable to the verdict." *Id.* (quoting *State v. Morgan,* 2012 S.D. 87, ¶ 10, 824 N.W.2d 98, 100) (internal quotation marks omitted). The issue is whether the evidence provided "is sufficient to sustain a finding of guilt beyond a reasonable doubt." *State v. Jensen,* 2007 S.D. 76, ¶ 7, 737 N.W.2d 285, 288 (quoting *State v. Lewis,* 2005 S.D. 111, ¶ 8, 706 N.W.2d 252, 255). "[T]his Court does not resolve conflicts in the evidence, or pass on the credibility of witnesses, or weigh the evidence." *Id.* (quoting *Lewis,* 2005 S.D. 111, ¶ 8, 706 N.W.2d at 255). We will not set aside a jury's verdict if the evidence presented, including all favorable inferences drawn from it, provides a rational theory that supports the jury's verdict. *State v. Motzko,* 2006 S.D. 13, ¶ 6, 710 N.W.2d 433, 437.

[¶ 40.] Defendant asserts that because the State did not provide any physical evidence of sexual penetration, the evidence was insufficient to support a finding of guilt beyond a reasonable doubt. Defendant also argues the victim, K.J., equivocated when she testified at trial and did not clearly express that sexual penetration occurred. Thus, he maintains the evidence was insufficient to sustain a verdict of guilty beyond a reasonable doubt. We disagree.

[¶ 41.] The State presented evidence of Defendant's confession where he admitted that he sexually penetrated K.J. Defendant's admission was corroborated with K.J.'s statements in the forensic interview on February 6, 2012, and testimony at trial. While there was no medical evidence, "[p]enetration can be inferred from circumstantial evidence and need not be proved by medical evidence." *State v. Toohey,* 2012 S.D. 51, ¶ 22, 816 N.W.2d 120, 129. The State also presented evidence that K.J. touched and rubbed Defendant's penis. As for K.J.'s allegedly equivocal testimony at trial, we do "not resolve conflicts in the evidence, or pass on the credibility of witnesses, or weigh the evidence." *Jensen,* 2007 S.D. 76, ¶ 7, 737 N.W.2d at 288 (quoting *Lewis,* 2005 S.D. 111, ¶ 8, 706 N.W.2d at 255). Our task in reviewing the sufficiency of the evidence is to determine whether the "evidence and all favorable inferences that can be drawn therefrom support a rational theory of guilt." *Motzko,* 2006 S.D. 13, ¶ 6, 710 N.W.2d at 437 (quoting *State v. Pasek,* 2004 S.D. 132, ¶ 7, 691 N.W.2d 301, 305) (internal quotation marks omitted). We conclude there was sufficient evidence to support a rational theory of guilt.

[¶ 42.] 6. *Whether the State's failure to provide certain evidence to Defendant was prejudicial requiring a new trial.*

*Analysis of Issue 6*

[¶ 43.] Lastly, Defendant asserts the State failed to provide or purposely withheld exculpatory evidence. The State allegedly withheld a physical examination of K.J. done after her forensic interview on February 6, 2012. Failure to disclose such a record is a potential violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "A *Brady* violation occurs when (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence has been suppressed by the State, either willfully or inadvertently; and (3) prejudice has ensued." *Thompson v. Weber,* 2013 S.D. 87, ¶ 38, 841 N.W.2d 3, 12 (quoting *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999)) (internal quotation marks omitted).

[¶ 44.] The circuit court never had the opportunity to determine whether the

State's failure to provide the physical examination was a violation of *Brady* because the defense did not learn of the examination until after sentencing. The circuit court made no findings of fact or conclusions of law on this issue. Defense counsel stated at oral arguments that the State has yet to provide the examination to her. Defendant would have us reverse and remand the case for a new trial. However, we cannot affirmatively say a new trial is warranted without ascertaining whether the alleged violation was prejudicial. Because the physical examination was not part of the record and the circuit court did not enter findings of fact or conclusions of law on the existence or nature of the alleged *Brady* violation, we remand the issue and instruct the State to disclose the physical examination to Defendant and the circuit court. We also instruct the circuit court to hold proceedings consistent with this opinion and enter findings of fact and conclusions of law as to whether there was a *Brady* violation and, if there was a violation, whether a new trial is warranted. Therefore, we remand this issue to the circuit court.

## Conclusion

[¶ 45.] As to issues 1 through 5, we affirm the circuit court. We remand issue 6 to the circuit court for proceedings consistent with this opinion.

[¶ 46.] ZINTER, SEVERSON, and WILBUR, Justices, and KONENKAMP, Retired Justice, concur.

[¶ 47.] KERN, Justice, not having been a member of the Court at the time this action was assigned to the Court, and being the trial judge in this case, did not participate.